# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JAMES CAPE & SONS COMPANY,

        Plaintiff,

    v.

        Case No. _____

PCC CONSTRUCTION COMPANY (f/k/a
STREU CONSTRUCTION COMPANY),
VINTON CONSTRUCTION COMPANY,
JOHN STREU, ERNEST J. STREU, JAMES J.
MAPLES, MICHAEL J. MAPLES and DANIEL
BEAUDOIN,

        Defendants.

## COMPLAINT

Plaintiff James Cape & Sons Company ("Plaintiff" or "James Cape"), by its attorneys

Quarles & Brady LLP, hereby sets forth the following allegations:

### NATURE OF THE LAWSUIT

1.      This action concerns a bid rigging scheme engaged in by defendants PCC

Construction Company f/k/a Streu Construction Company ("Streu Co."), Vinton Construction

Company ("Vinton Co."), Ernest J. Streu, John Streu, James J. Maples, Michael J. Maples, and

Daniel Beaudoin. In particular, defendants engaged in a scheme to submit rigged,

noncompetitive bids for at least 26 street, highway, and airport construction projects awarded by

the Wisconsin Department of Transportation ("WisDOT"), other public bidding authorities, and,

upon information and belief, private owners. This scheme – which lasted over several years and

resulted in criminal convictions of several defendants for violations of the Sherman Antitrust Act

(15. U.S.C. § 1) – injured James Cape in that such scheme deprived James Cape of being

awarded multi-million dollar public and private construction contracts which would have resulted in substantial profits to James Cape. The defendants conspired to take work from James Cape for the defendants' benefit and to James Cape's detriment.

2.     In late August and early September of 2004, plea agreements were filed for defendants Streu Co., Vinton Co., Ernest J. Streu, John Streu, James J. Maples, and Michael J. Maples in Case No. 04-CR-53 in the United States District Court for the Eastern District of Wisconsin. Each of these defendants pled guilty to one count of violating 15 U.S.C. § 1.

3.     In doing so, defendants Streu Co., Vinton Co., Ernest J. Streu, John Streu, James J. Maples, and Michael J. Maples admitted to the following facts, as well as others:

> Beginning before 1999 and continuing through January 13, 2004, [defendants] and others agreed to submit rigged or noncompetitive bids for street, highway, and airport construction projects awarded by the Wisconsin Department of Transportation (WisDOT) and other bidding authorities in the State and Eastern District of Wisconsin. Generally, [defendants] would meet in person ... to allocate upcoming construction projects among themselves and to arrange for each other to submit complementary bids for or refrain from bidding on particular projects.
>
> In advance of specific bid deadlines, [defendants] would contact one another to exchange last-minute numbers and confirm each other's bids. After exchanging this information, [defendants] would cause rigged bids to be submitted from their offices to WisDOT and other entities. With respect to projects awarded by WisDOT, the rigged bids would be accompanied by false certifications that the bidder had not participated in any collusion or taken any action in restraint of free competitive bidding.

4.     Upon information and belief, Vinton Co. received contracts totaling at least $30 million for projects that were the subject of the illicit scheme.

5.     Upon information and belief, Streu Co. received contracts totaling at least $32.9 million for projects that were the subject of the illicit scheme.

6.      The scheme engaged in by defendants constitutes not only a violation of 15

U.S.C. § 1, but also Wis. Stat. § 946.83(3) (the Wisconsin Organized Crime Control Act), thus

entitling James Cape to multiple damages pursuant to 15 U.S.C. § 15 and Wis. Stat. § 946.87(4).

Such scheme also constitutes an unlawful conspiracy, fraud, tortious interference with

prospective contractual relations under Wisconsin law, and a violation of the Wisconsin Antitrust

Statute, also entitling James Cape to damages.

## THE PARTIES

7.      Plaintiff James Cape & Sons Company is a Wisconsin corporation with its

principal offices located at  6422 N. Highway 31, Racine, Wisconsin 53402.  James Cape is one

of the oldest concrete paving companies in the United States.

8.      Defendant PCC Construction Company f/k/a Streu Construction Company ("Streu

Co.") is a Wisconsin corporation with its principal place of business in Two Rivers, Wisconsin.

During the time period in question, Streu Co. was engaged in the highway construction industry

in Wisconsin.

9.      Defendant Vinton Construction Company ("Vinton Co.") is a Michigan

corporation with its principal place of business in Manitowoc, Wisconsin.  During the time

period in question, Vinton Co. was engaged in the highway construction industry in Wisconsin.

10.     Upon information and belief, defendant Ernest J. Streu during the time period in

question was a resident of Two Rivers, Wisconsin and the President of Streu Construction

Company.

11.     Upon information and belief, defendant John Streu during the time period in

question was a resident of Two Rivers, Wisconsin and the Treasurer of Streu Construction

Company.

- 3 -

12.     Upon information and belief, defendant James J. Maples during the time period in question was a resident of Manitowoc, Wisconsin and the President of Vinton Construction Company.

13.     Upon information and belief, defendant Michael J. Maples during the time period in question was a resident of Manitowoc, Wisconsin and the Vice President of Vinton Construction Company.

14.     Defendant Dan Beaudoin is a Wisconsin resident.  During the time period in question, Beaudoin was an employee of James Cape who acted without authority for, and without the knowledge of, James Cape in conspiring with the other defendants.

15.     Defendants Ernest Streu, John Streu, James Maples, Michael Maples, and Dan Beaudoin are referred to collectively in this Complaint as the "Individual Defendants."

## JURISDICTION AND VENUE

16.     Jurisdiction over James Cape's claim under the Sherman Act, Clayton Act, Racketeering Influenced and Corrupt Organizations Act is proper under 28 U.S.C. §§ 1331, 1337(a), 15 U.S.C. §§ 1, 15, and 18 U.S.C. § 1964(c), and jurisdiction over the related state law claims, which arise out of the same body of facts, is proper under 28 U.S.C. § 1367(a) and the principles of supplemental jurisdiction.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c).

## ALLEGATIONS

18.     The allegations set forth in this Complaint were drawn from four primary sources: (a) the Affidavit in Support of Criminal Complaints, Arrest Warrants and Search Warrants of Special Agent David A. Gorr (attached as Exhibit A), (2) the Indictment filed in Case No. 04-CR-53, United States District Court, Eastern District of Wisconsin, (3) the Plea Agreements of

- 4 -

the defendants (Exhibits B through G), and (4) the List of Lettings of the Wisconsin Department of Transportation.

## I.    THE BIDDING PROCESS

19.    Throughout the duration of defendants' bid rigging scheme, the WisDOT administered the bid letting process for highway construction projects in Wisconsin that were paid for by federal, state, and local funds.

20.    Federal and state laws require that competitive bids be submitted for public highway construction projects. The State of Wisconsin further requires each bidder to submit a sworn statement indicating that the bidding company has not participated in collusion or taken any action in restraint of free competitive bidding. Any bid that did not contain such certification would be automatically rejected.

21.    On at least an annual basis, WisDOT publishes a Master Contract Schedule designed to provide contractors with WisDOT's best estimate of when projects will be ready for award. This list includes the type of construction, anticipated letting date, and scheduled construction dates.

22.    During the time period in question, the WisDOT held bid lettings for highway construction projects at 9:00 am on the second Tuesday of each month. Approximately five weeks prior to each letting date, WisDOT advertised the specific projects to be awarded, and makes available proposals, plans, and specifications for each project.

23.    Prior to late 2002, the bid lettings were held in person at the Concourse Hotel in Madison, Wisconsin. Contractors usually would arrive at the hotel well prior to the letting to finish and submit their bids prior to the deadline. Their bids would be submitted in person along with an "Affidavit of Non-Collusion" certifying that the bidder had not "either directly or

- 5 -

indirectly, entered into any agreement, participated in any collusion, or otherwise taken any action, in restraint of free competitive bidding with the submitted bid."

24.     Beginning in December of 2002, WisDOT began using an internet-based service, Info Tech, Inc. ("Info Tech") in Gainesville, Florida, to handle the letting process. Info Tech would make available bidding information, including project documentation, in electronic format through a service known as the "Bid Express on-line bidding exchange." Info Tech would also receive the electronic bids submitted by contractors through the Info Tech website. The contractors "signed" their bids by using a digital identification code.

## II.     THE SCHEME

### A.     Defendants' Role in the Scheme

25.     Beginning in approximately 1997, and continuing until on or about January 13, 2004, defendants agreed to engage in a fraudulent scheme to rig the bidding process administered by the WisDOT. Upon information and belief, defendants also agreed to rig other public and private construction bidding processes.

26.     To implement this scheme, the Individual Defendants would meet to discuss upcoming projects that were going out to bid. During these meetings – which upon information and belief were conducted in person and on the telephone – the Individual Defendants would share bid information, discuss potential competitors, and agree to rig bids in an attempt to allocate projects among themselves.

27.     Upon information and belief, in late 1996 John Streu approached Beaudoin and recruited him to be a part of the scheme. Thereafter, some time during 1997 or 1998, Beaudoin, John Streu, Ernest Streu, and James Maples met for the first time at the Sheboygan McDonalds, then got into a car and drove around for one and one half hours to two hours to discuss upcoming

- 6 -

projects. This was the first of a series of in person meetings held twice a year to discuss and agree upon the allocation of projects listed on the WisDOT's Master Contract Schedule and other projects let by other private and public bidding authorities. The participants expressed their interests in the projects, discussed other potential bidders, shared information about each company's costs, and agreed which company should be allocated which projects. Upon information and belief, Beaudoin also shared James Cape's confidential business information with the other defendants.

28. Upon information and belief, during a meeting in a parking lot on December 18, 2003, which was monitored by the Federal Bureau of Investigations, James Maples, Michael Maples, John Streu, and Beaudoin discussed upcoming projects and referred to their history of bid rigging. Prior to such meeting, John Streu confirmed to Beaudoin that he kept documents reflecting the division of highway projects among the conspirators.

29. In advance of the specific letting dates, defendants would also contact one another by telephone, share proprietary bid information, confirm the agreement as to specific rigged bids being submitted, rig their bids, and submit their non-competitive bids. Upon information and belief, some of such calls occurred as close to five minutes before a bid letting deadline with the WisDOT. As a result of such last minute calls, some Streu Co. and Vinton Co. bids were lowered at the last minute so as to guarantee the award of the project.

30. During such calls, the defendants spoke in code to disguise their real purposes. For example, they talked about an upcoming "convention" rather than project lettings. They referred to in-person meetings as "sub-committee" meetings. They also used the names "Kevin," "Clint," "Reed," and "Denny" as code names, which were names of board members and employees of the Wisconsin Concrete Pavement Association.

- 7 -

31.     Defendants James Maples, Michael Maples, Ernest Streu, and John Streu were all principals of their companies. In this scheme, they acted on their own behalf and on behalf of their respective companies. Given their positions in their respective companies, these defendants were able to, and did, adjust the bids of their respective companies downward or upwards upon receiving information through the scheme of competitor bid information.

32.     As a result of the scheme, defendants were able to obtain construction contracts through the WisDOT that they otherwise would not have. They were also able to submit inflated bids to the WisDOT on projects they knew they would receive pursuant to the scheme. As a result, WisDOT was overcharged at least $1,400,000 by Vinton as a result of rigged bids, and overcharged at least $500,000 by Streu as a result of rigged bids.

**B.      Beaudoin's Role in the Scheme**

33.     Beaudoin was an area manager for James Cape and as part of his job worked on estimates for some bids submitted to WisDOT.

34.     James Cape was not aware of Beaudoin's activity up and until early 2003, when another James Cape employee began to suspect that Beaudoin was passing bid information to competitors.

35.     In March of 2003, James Cape reported Beaudoin to the United States Attorney's Office for the Eastern District of Wisconsin.

36.     Beaudoin upon information and belief subsequently began cooperating with the Federal Bureau of Investigations at the FBI's request. As part of his cooperation, Beaudoin allowed the FBI to tape his telephone conversations with the other Individual Defendants.

- 8 -

37.     James Cape retained Beaudoin at the request of the FBI so that an investigation could be conducted. James Cape terminated Beaudoin after the arrest of the other Individual Defendants.

### III.    THE PREDICATE ACTS

38.     Each use of the telephone and internet by defendants to carry out their illicit scheme, which resulted in manipulation of the bidding process conducted by WisDOT and others, constitutes a single violation of the federal Wire Fraud statute, 18 U.S.C. § 1343:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

39.     Upon information and belief, defendants used the telephone regularly in executing their illicit scheme starting at the scheme's inception in 1997 and continuing through 2004.

40.     Each use of the telephone to advance the scheme constitutes a single act of wire fraud. Examples of telephone calls used to advance the scheme include, without limitation, the following.

### A.    Telephone Calls Relating To April 20, 1999 Lettings

41.     On April 20, 1999, a WisDOT letting occurred with bidders submitting bids in person.

42.     Upon information and belief, prior to 9:00 am on April 20, 1999, telephone calls were made between and among Beaudoin and some or all of the other Individual Defendants.

43.     Upon information and belief, each of these calls was placed in order to share confidential information with the other defendants concerning James Cape's bids in order to execute the illicit scheme described above.

44.     During that bidding process, James Cape bid on a project with the call order of 28. On that project, James Cape was the second lowest bidder, with Vinton Co. as the lowest bidder by approximately $43,000 on a $1.5 million project.

45.     James Cape also bid on a project with the call order of 65. On that project, James Cape was the second lowest bidder, with Streu Co. as the lowest bidder by approximately $1,500 on a $650,000 project.

**B.      Telephone Calls Relating To December 11, 2001 Letting**

46.     On December 11, 2001, a WisDOT letting occurred with bidders submitting bids in person.

47.     Upon information and belief, prior to 9:00 am on December 11, 2001, telephone calls were made between and among Beaudoin and some or all of the other Individual Defendants.

48.     Upon information and belief, each of these calls was placed in order to share confidential information with the other defendants concerning James Cape's bids in order to execute the illicit scheme described above.

49.     During that bidding process, James Cape bid on a project with the call order of 2. On that project – an $11 million project, the largest let that day – James Cape was the second lowest bidder with Streu Co. as the lowest bidder by approximately $93,500. The third bidder's bid was approximately $662,000 higher than James Cape's bid.

**C.    Telephone Calls Relating To February 11, 2003 Lettings**

50.    On February 11, 2003, a WisDOT letting occurred with bidders submitting bids via the internet.

51.    Prior to 9:00 am on February 11, 2003, Beaudoin placed calls to both Streu Co. and Vinton Co.  These calls included an 11 minute call to Streu Co. on February 3, 2003. Between February 3 and February 10, 2003, Beaudoin called Vinton Co. six times.

52.    Upon information and belief, each of these calls was placed in order to share confidential information with the other defendants concerning James Cape's bids in order to execute the illicit scheme described above.

53.    During that bidding process, James Cape bid on three projects.  For each project, Vinton Co. was the lowest bidder, and Streu the second lowest bidder.

54.    The bids submitted by Vinton Co. and Streu Co. were made in electronic format and via interstate wire communication from Wisconsin to Florida.

**D.    Telephone Calls Related To February 25, 2003 Letting**

55.    On February 25, 2003, a letting occurred concerning a municipal non-WisDOT project.

56.    Prior to 9:00 am on February 25, 2003, Beaudoin called Vinton Co. on one occasion and Streu Co. on six occasions.  One of the calls to Streu was a nine minute call placed at 2:41 am on the morning of the letting.

57.    Upon information and belief, each of these calls was placed in order to share confidential information with the other defendants concerning James Cape's bids in order to execute the illicit scheme described above.

58.    The lowest bidder on this project was Vinton Co.

- 11 -

**E.    Telephone Calls Related To March 11, 2003 Letting**

59.    On March 11, 2003, a WisDOT letting occurred with bidders submitting bids via the internet.

60.    Prior to March 11, 2003, Beaudoin placed eight calls to Vinton Co.  On the date of the bidding, Beaudoin used a direct connect feature on a phone to contact Vinton Co. three times before the letting, with contacts occurring between 8:38 a.m. and 8:59 a.m.

61.    Upon information and belief, each of these calls was placed in order to share confidential information with the other defendants concerning James Cape's bids in order to execute the illicit scheme described above.

62.    Prior to March 11, 2003, Beaudoin placed three calls to Streu Co. In addition, on the day of the letting, Beaudoin used a direct connect feature of a phone to contact Streu Co. five times between 6:06 a.m. and 8:59 a.m.

63.    During that bidding process, James Cape bid on four projects.  James Cape was underbid on each of these projects by either Vinton Co. or Streu Co.  On one of the projects – Highway 57 in Ozaukee County – James Cape was underbid by less than $10,000 by Vinton.

64.    The bids submitted by Vinton Co. and Streu Co. were made in electronic format and via interstate wire communication from Wisconsin to Florida.

**F.    Telephone Calls Related To April 8, 2003 Letting**

65.    On April 8, 2003, a WisDOT letting occurred with bidders submitting bids via the internet.

66.    On April 8, 2003, Beaudoin was observing the bid preparation process at James Cape.  The FBI arranged to have false inflated bid numbers passed to Beaudoin concerning a paving project in Brown County.

- 12 -

67.     Just before 8:30 am, Beaudoin was observed leaving the conference room, entering a conference room, and making a call to Vinton. Upon information and belief, the false bid amounts were conveyed to Vinton.

68.     James Cape submitted bids for three projects and won each bid.

**G.      Telephone Calls Related To Post-October 2003 Lettings**

69.     Between October 6, 2003 and January 12, 2004, Beaudoin placed over twelve recorded calls to James Maples, Ernest Streu, and John Streu, where the participants discussed the need to meet and divide up upcoming construction projects.

70.     For example, on October 6, 2003, Beaudoin and John Streu participated in a telephone call in which they talked about the need to get together in advance of the upcoming WisDOT letting.

71.     On October 31, 2003, Beaudoin had a telephone conversation with Ernest Streu in which the participants also discussed getting together for a "convention" to divide up projects.

72.     On December 10, 2003, Beaudoin had a telephone conversation with James Maples to discuss setting up a conference during December of 2003.

73.     On December 19, 2003, Beaudoin had a telephone conference with James Maples regarding a disagreement between Streu Co. and Vinton Co. regarding the allocation of a private construction project.

74.     On January 8, 2004, Beaudoin had a telephone conversation with James Maples in which James Maples confirmed that the conspirators had reached an agreement with respect to the upcoming WisDOT letting on January 13, 2004.

75.     On January 9, 2004, Beaudoin had a telephone conversation with John Streu in which John Streu confirmed that the conspirators had reached an agreement with respect to the

- 13 -

upcoming WisDOT letting on January 13, 2004. John Streu further stated that representatives of Streu Co. and Vinton Co. had met without Beaudoin to discuss the WisDOT letting.

## IV. THE END OF THE SCHEME

76. On January 13, 2004, the date of a WisDOT letting, defendants Ernest Streu, John Streu, James J. Maples, and Michael Maples were arrested on bid rigging charges.

77. According to a press release issued by the United States Department of Justice, the defendants had agreed to rig bids on 5 projects let on January 13, 2004.

78. On January 21, 2005, a criminal conviction was entered against Streu Co. sentencing it to 5 years probation, a $320,000 fine, and ordering it to pay restitution to WisDOT totaling $480,000.00.

79. On January 21, 2005, a criminal conviction was entered against Ernest J Streu sentencing him to 12 months and 1 day of imprisonment, an additional 1 year under supervised release, a fine of $215,000.00, and restitution totaling $10,000.00 to the WisDOT.

80. On January 21, 2005, a criminal conviction was entered against John Streu sentencing him to 5 months of imprisonment, an additional 1 year under supervised release, a fine of $65,000.00, and restitution totaling $10,000.00 to the WisDOT.

81. Vinton Co., James J. Maples, and Michael J. Maples are scheduled to be sentenced in April of 2005.

## COUNT I – SHERMAN ACT §1, CONSPIRACY UNREASONABLE RESTRAINT OF TRADE

82. James Cape realleges and incorporates by reference herein Paragraphs 1 through 81 above.

- 14 -

83.     Beginning in approximately 1997 and continuing until approximately January 13, 2004, defendants engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

84.     The combination and conspiracy consisted of a continuing agreement, understanding, and concerted action among the defendants to submit non-competitive and "rigged" bids to the State of Wisconsin, and various other bidding authorities within the State of Wisconsin, for public road, highway, bridge, street, and airport construction projects, the vast majority of which were federally funded at least in part ("highway construction projects").

85.     For the purpose of forming and carrying out the combination and conspiracy, defendants took various actions, including the following:

> (a) discussing among themselves the prospective submission of bids for highway projects,
>
> (b) allocating highway construction projects among themselves,
>
> (c) designating which coconspirator would submit the low bid for the project and which of the co-conspirators would submit higher, complementary bids for the project or would not submit a bid at all for the project;
>
> (d)     Submitting non-competitive, rigged bids to the State of Wisconsin and others;
>
> (e)     Accepting payment from the State of Wisconsin and others for work done on highway construction projects awarded as a result of non-competitive and rigged bids submitted in furtherance of the conspiracy; and
>
> (f)     Concealing and attempting to conceal the conspiracy.

86.     During the conspiracy, substantial quantities of materials and equipment were transported across state lines in a continuous and uninterrupted flow of interstate commerce and in a manner substantially affecting interstate commerce, for use in highway construction projects rigged by defendants.

- 15 -

87.     Some highway construction projects rigged pursuant to the conspiracy were part of the interstate highway system, and the vast majority of the projects were at least in part federally funded. This resulted in the transfer of a substantial amount of federal funds from outside of the State of Wisconsin into the State of Wisconsin.

88.     In addition, defendants electronically submitted bids, including numerous rigged bids, from Wisconsin to a data processing company in Florida for retransmittal back to Wisconsin after the bids were closed.

89.     The business activities of defendants were within the flow of, and substantially affected, interstate commerce.

90.     As a result of the conduct of defendants as described above, competition in the relevant market has been injured, James Cape has sustained monetary damages, damage to its reputation, and loss of goodwill, and consumers have lost the benefits of competition in the relevant market.

91.     The defendants, through their bid rigging conspiracy, prevented James Cape from winning bids that the defendants had allocated to themselves, by revealing to Streu Co. and Vinton Co., in advance, the bid James Cape was going to submit, so that one of them could undercut it by a small amount and win the bid with certainty whenever they chose to do so.

92.     Pursuant to 15 U.S.C. §§ 1 and 15, James Cape is entitled to a finding in its favor on this count, an award of treble damages, and attorney's fees.

### COUNT II – WIS. STAT. § 133.03(1) UNREASONABLE RESTRAINT OF TRADE

93.     James Cape realleges and incorporates by reference herein Paragraphs 1 through 92 above.

- 16 -

94.     Beginning in approximately 1997 and continuing until approximately January 13, 2004, defendants engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Wis. Stat. § 133.03(1).

95.     The combination and conspiracy consisted of a continuing agreement, understanding, and concerted action among the defendants to submit non-competitive and "rigged" bids to the State of Wisconsin, and various other bidding authorities within the State of Wisconsin, for public road, highway, bridge, street, and airport construction projects, the vast majority of which were federally funded ("highway construction projects").

96.     For the purpose of forming and carrying out the combination and conspiracy, defendants took various actions, including the following:

> (a) discussing among themselves the prospective submission of bids for highway projects,
>
> (b) allocating highway construction projects among themselves,
>
> (c) designating which coconspirator would submit the low bid for the project and which of the co-conspirators would submit higher, complementary bids for the project or would not submit a bid at all for the project;
>
> (d)     Submitting non-competitive, rigged bids to the State of Wisconsin and others;
>
> (e)     Accepting payment from the State of Wisconsin and others for work done on highway construction projects awarded as a result of non-competitive and rigged bids submitted in furtherance of the conspiracy; and
>
> (f)     Concealing and attempting to conceal the conspiracy.

97.     As a result of the conduct of defendants as described above, competition in the relevant market has been injured, James Cape has sustained monetary damages, damage to its reputation, and loss of goodwill, and consumers have lost the benefits of competition in the relevant market.

98. The defendants, through their bid rigging conspiracy, prevented James Cape from winning bids that the defendants had allocated to themselves, by revealing to Streu Co. and Vinton Co., in advance, the bid James Cape was going to submit, so that one of them could undercut it by a small amount and win the bid with certainty whenever they chose to do so.

99. Pursuant to Wis. Stat. § 133.18(1)(a), James Cape is entitled to a finding in its favor on this count, an award of treble damages, and attorney's fees.

## COUNT III – RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (18 U.S.C. § 1962(c) and § 1964(a))

100. James Cape realleges and incorporates by reference herein Paragraphs 1 through 99 above.

101. The WisDOT is an enterprise as defined under 18 U.S.C. § 1961(4).

102. Wire fraud is a racketeering act as defined under 18 U.S.C. § 1961(1).

103. Beginning in approximately 1997 and continuing until approximately January 13, 2004, defendants engaged in scheme to submit non-competitive and "rigged" bids to the WisDOT.

104. Throughout this entire period, defendants utilized the bidding mechanisms set up by the WisDOT for the letting of public construction projects in order to implement and further their scheme. By submitting rigged bids, defendants participated in the conduct of the enterprise – i.e. the bidding processes established by the WisDOT.

105. In submitting rigged bids, defendants engaged in a pattern of racketeering activity, in that they committed two or more acts of wire fraud by (1) utilizing telephones prior to WisDOT letting dates in order to orchestrate their rigged bids and (2) utilizing the internet, and thus the wires, to submit false bids and affidavits to the WisDOT.

- 18 -

106. As a result of the conduct of defendants as described above, James Cape has sustained monetary damages, damage to its reputation, and loss of goodwill.

107. Pursuant to 18 U.S.C. § 1964(c), James Cape is entitled to a finding in its favor on this count, an award of treble damages, and attorney's fees.

## COUNT IV – WISCONSIN ORGANIZED CRIME CONTROL ACT WIS. STAT. § 946.83(3)

108. James Cape realleges and incorporates by reference herein Paragraphs 1 through 107 above.

109. The WisDOT is an enterprise as defined under Wis. Stat. § 946.82(2).

110. Wire fraud is a racketeering act as defined under Wis. Stat. § 946.82(4).

111. Beginning in approximately 1997 and continuing until approximately January 13, 2004, defendants engaged in scheme to submit non-competitive and "rigged" bids to the WisDOT.

112. Throughout this entire period, defendants utilized the bidding mechanisms set up by the WisDOT for the letting of public construction projects in order to implement and further their scheme. By submitting rigged bids, defendants participated in the conduct of the enterprise – i.e. the bidding processes established by the WisDOT.

113. In submitting rigged bids, defendants engaged in a pattern of racketeering activity, in that they committed more than three acts of wire fraud by (1) utilizing telephones prior to WisDOT letting dates in order to orchestrate their rigged bids and (2) utilizing the internet, and thus the wires, to submit false bids and affidavits to the WisDOT.

114. As a result of the conduct of defendants as described above, James Cape has sustained monetary damages, damage to its reputation, and loss of goodwill.

115.    Pursuant to Wis. Stat. § 946.87(4), James Cape is entitled to a finding in its favor on this count, an award of double damages, and attorney's fees.

## COUNT V – CONSPIRACY

116.    James Cape realleges and incorporates by reference herein Paragraphs 1 through 115 above.

117.    Beginning in approximately 1997 and continuing until approximately January 13, 2004, defendants engaged in a conspiracy in violation of Wisconsin law.

118.    The conspiracy consisted of a continuing agreement, understanding, and concerted action among the defendants to submit non-competitive and "rigged" bids to the State of Wisconsin, and various other bidding authorities within the State of Wisconsin, for public road, highway, bridge, street, and airport construction projects.

119.    For the purpose of forming and carrying out the conspiracy, defendants took various actions, including the following:

> (a) discussing among themselves the prospective submission of bids for highway projects,
>
> (b) allocating highway construction projects among themselves,
>
> (c) designating which coconspirator would submit the low bid for the project and which of the co-conspirators would submit higher, complementary bids for the project or would not submit a bid at all for the project;
>
> (d)    Submitting non-competitive, rigged bids to the State of Wisconsin and others;
>
> (e)    Accepting payment from the State of Wisconsin and others for work done on highway construction projects awarded as a result of non-competitive and rigged bids submitted in furtherance of the conspiracy; and
>
> (f)    Concealing and attempting to conceal the conspiracy.

- 20 -

120.   As a result of the conduct of defendants as described above, James Cape has sustained monetary damages, damage to its reputation, and loss of goodwill.

## COUNT VI– TORTIOUS INTERFERENCE
## WITH PROSPECTIVE CONTRACT

121.   Plaintiff realleges and incorporates by reference herein Paragraphs 1 through 120 above.

122.   James Cape and WisDOT had actual or prospective business relationships.

123.   James Cape and other owners or public authorities had actual or prospective business relationships.

124.   The defendants were aware of James Cape's contracts and prospective contracts.

125.   By its acts set forth above, defendants intentionally improperly interfered with prospective contracts between James Cape and WisDOT and others.

126.   As a direct and proximate result of such interference, James Cape was denied projects and has sustained monetary damages, damage to its reputation, and loss of goodwill.


**JAMES CAPE & SONS COMPANY HEREBY REQUESTS A TRIAL BY JURY**

WHEREFORE, James Cape asks that this Court enter judgment in its favor and against defendants on all causes of action, and:

1. award James Cape money damages;

2. award James Cape multiple damages;

4. award James Cape its costs and reasonable attorneys' fees;

5. award James Cape damages permitted by Wisconsin law, as well as costs, disbursements, and interest on all damages;

6. award James Cape such other and further relief as the Court deems just and proper.

Dated this 10th day of March, 2005.

MATTHEW J. FLYNN
CRISTINA D. HERNANDEZ-MALABY

QUARLES & BRADY LLP
411 East Wisconsin Avenue
Suite 2040
Milwaukee, WI 53202-4497

Attorneys for plaintiff
James Cape & Sons Company

QBMKE\5706463.1

- 22 -